UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                          Bankruptcy No. 09-31529
                                                Chapter 7
Lawrence D. Danduran, Jr.,

                        Debtor.
_____/

Kip M. Kaler as Bankruptcy Trustee
for Lawrence D. Danduran, Jr.,

                        Plaintiff,

                vs.                             Adversary No. 10-7012

Lawrence D. Danduran, Jr.,

                        Defendant.
_____/


MEMORANDUM AND ORDER

This adversary proceeding arises by complaint filed May 21, 2010, by Chapter 7 Bankruptcy

Trustee Kip M. Kaler, seeking a denial of Debtor Lawrence D. Danduran Jr.'s bankruptcy discharge

under 11 U.S.C. § 727(a)(2), (3) and (4).  By Answer filed October 8, 2010, Debtor denies he

committed any conduct justifying the denial of his discharge.  The matter was tried on February 10

and February 17, 2011.  The following constitutes the Court's findings of fact and conclusions of

law.

I.  FINDINGS OF FACT

Debtor is 48 years old and has been in sales most of his life. He testified that he was

encouraged to move to New Rockford, North Dakota by his wife's father who owned New Rockford

Chevrolet-Oldsmobile, Inc. ("the dealership"), and had no successor for the business.  Debtor and

his wife, Julie, moved to New Rockford and joined the dealership in 1992. Debtor worked as a salesman and detailer. He said he also learned about the dealership business in general. Julie and her mother handled the dealership's accounting and finances.

In 1997, Julie's dad retired, and Debtor and Julie bought the dealership. Julie continued to handle the dealership's finances. Debtor did not have any role in the dealership's finances, and he said he had no knowledge of what the balance sheet looked like at the time. Debtor testified that although things were tight financially, they were growing the dealership.

Debtor and Julie separated in September 2008. Although Debtor studied electronics and engineering in school, he had no real experience in either field. He went to Phoenix and worked for Coyote Wireless Consulting. Debtor temporarily resided with the owner of Coyote, and learned the trade of diagnostic work on cell phone towers. Coyote was in its early stages, and Debtor made very little income. He was not paid at a specific rate, but rather was paid a percentage of each job he performed, and he estimated he made between $5,000.00 and $6,000.00 during the few months he worked there. His expenses were also paid.

At the end of January 2009, Debtor returned to North Dakota for his divorce proceedings. Debtor and Julie signed a property settlement agreement on February 3, 2009. It provided that Debtor received the dealership and was solely responsible for all the business debt with the exception of a personal loan that remained Julie's responsibility.

An exhibit attached to the property settlement agreement lists the dealership's net business value as -$817,556.00. When asked why he would have wanted the business considering its financial condition, Debtor testified that he wanted control of the business for once because Julie had always been in charge. Debtor also said that the finances were a moving target that he did not

2

understand well.  Prior to his return to North Dakota for the divorce, he had not looked through the dealership's financials because their complexity would have rendered them meaningless to him. Moreover, Debtor testified, he got the dealership "in the 11th hour" of the divorce settlement.  He had not planned on taking over the dealership, but rather, had planned to return to Arizona after the divorce was finalized. He had a return flight ticket already purchased.

The property settlement agreement also details other assets that were divided between Debtor and Julie.  Debtor received $77, 154.00 in retirement accounts and $36,869.00 in household goods. Debtor testified that the values for the household goods came from an appraisal prepared by Steffes Auctioneers, dated October 28, 2008, and listing a total of $77,745.00 of assets.  Debtor testified, however, that he did not receive all the property he was awarded in the divorce.  For example, his property distribution includes a set of silver flatware valued at $4,000.00, but Debtor testified that the flatware disappeared and he never received it.  Further, Debtor sold some of the property in the year following his divorce.  Those sales are discussed more fully below.

Debtor became active in the dealership's operation immediately after the divorce and realized the problems with the finances in the coming weeks. Communication with GMAC and North Star Community Credit Union revealed that many vehicles were not paid for and had been financed with both institutions.  The operating capital was low, the business did not have liquid assets, and Debtor had to meet payroll needs.  Debtor testified he knew the dealership was important to the community and he had a strong desire to make it work.

Debtor consulted an attorney in early 2009 to address the issues with the dealership.  He considered possible alternatives, including bankruptcy, but told his attorney he was not interested

3

in bankruptcy at the time.[1]  He said he tried to avoid bankruptcy at all cost.  His attorney gathered

all of Debtor's financial information, and Debtor tried various ways to keep the dealership afloat.

He testified he reduced expenses and tried to "stop the bleeding" from various loan payments,

insurance, taxes, and other liabilities. Debtor testified that from February 2009 until the date of his

bankruptcy filing in December, he was liquidating assets and eliminating liabilities as he was able.

In February, Debtor sold a boat for $14,000.00. He testified he paid off the $8,300.00 debt

against it and put the proceeds into his personal account.  Debtor also sold two gold coins in

February for a total of $1,979.20, and put the proceeds into his personal account.  He testified he

sold them so he could satisfy his tax liabilities.

Debtor also started looking to sell two parcels of real property.  The first was a duplex.  He

had a renter in the duplex, but he was not making any money on it. The second was a lot where he

kept most of the dealership's car inventory ("the Highway 281 property").  The Highway 281

property was a basic asphalt lot with a small, dilapidated sales building. He turned to Vorland Land

Company to determine the values of the properties.

The Highway 281 property sold in February 2009.  The buyer owned the adjacent property

and had expressed interest in purchasing it in the past in order to expand.  Debtor approached him

and sold it to him with the understanding that Debtor could continue to use the lot until June when

he would move the inventory to another of his properties, a former school lot. He sold the Highway

---

[1] Debtor and his attorney did discuss what Debtor would be able to keep as exempt
property in bankruptcy although Debtor thought it was later than February. Debtor said they also
discussed what types of loans were nondischargable at some point but he was not sure when.

281 property for $25,000.00 and put the money into his personal bank account because, he testified, he had owned the lot personally.

Debtor next sold a lot that was a city block of grass. Debtor testified he had not been making any income on the property, and he sold it for an amount that satisfied the loan against it and the tax liability.

Debtor testified that at the end of February, he had to sell a tow truck to make payroll.

In March 2009, GMAC repossessed its collateral from the dealership, including all the new and program option cars on the lot as well as some used cars. North Star also provided floor planning for the dealership, and Debtor testified they also repossessed their inventory in March 2009.[2]

After GMAC and North Star repossessed their vehicles, Debtor had to let all the dealership employees go. His next challenge was to reimburse a customer for a vehicle the customer bought but never received. Debtor testified he came up with the money by selling some parts including hoists.

In April 2009, Debtor sold a Chevrolet Aveo that was a personal vehicle and received a payoff check in the amount of $8,409.71. Debtor testified that he netted "maybe a little," but also thought he might have had to pay a little bit. In other words, he said, it was "basically a wash."

The duplex sold on June 1, 2009, and Debtor netted $5,247.88.

By June 2009, the only remaining dealership assets were the building, the remaining parts inventory and shop equipment. Debtor testified the building needed a lot of work, including a new

---

[2] Community Credit Union provided floor planning for the used Corvette inventory, but it did not repossess until several months after GMAC and North Star. Community Credit Union had nine or ten vehicles as collateral, and in this instance the floor plan matched the inventory.

5

roof for the service shop.  Insurance and taxes on the property were draining him, and he was not

making any money.  Debtor needed a capital investment to make the business work, and although

he had had potential investors interested at some point, by June 2009 they had all opted out.  Debtor

did not see any way to get the business back on its feet.  Vorland Land Company determined the

value of the dealership, and on June 15, 2009, Debtor sold the downtown dealership property within

10 percent of the list price, netting him $45,704.13.  He left the remaining parts and equipment in

the building when he sold it.

On the same day as the sale of the dealership, June 15, 2009, Debtor paid off a debt to Bank

of North Dakota for which Debtor was obligated on his son's student loans.  Debtor testified that

the loan was from fall 2006, and he did not realize when the loan originated that it was solely in his

name.  He testified that Julie prepared the loan documents, and Debtor signed them without realizing

he was "on the hook."  Debtor testified he realized he was liable on the loans in spring 2009.  Debtor

further testified that he never paid monthly on the loan because he hoped not to have to pay on the

loan at all. A loan statement dated March 20, 2009, includes handwritten notes indicating that the

total payoff amount for three accounts totaled $24,375.60 as of June 17, 2009, and that it was paid

by check on June 15, 2009. Debtor testified that he did not know these debts would not have been

discharged in bankruptcy until the trustee told him.

Both GMAC and North Star sued Debtor that summer to recover the deficiency between the

amount owed and the value of the their repossessed collateral. Debtor testified he was trying to find

ways to pay them back.  In addition to liquidating assets on an ongoing basis, he also applied for

jobs.  Debtor tried to find a high-paying job to make a dent in the debt.  There were not any jobs

available in New Rockford so he posted his resume online but he did not get any interviews.  He also

6

revisited another business idea he had, manufacturing dolls in the likenesses of newborn babies as novelty keepsakes. Debtor holds a patent on the process, but testified that he needed a lot of capital to get it going.

Debtor bought a lawnmower for $640.93 on July 16, 2009.

On August 19, 2009 Debtor sold the land portion of the former school property he owned. He netted $13,076.98.

On August 22, 2009, Debtor sold a gun safe and two guns for a total of $3,000.00. He testified he sold them because he had better uses for the money and the safe was a very large item in his home. He was also considering selling him home at the time. Debtor testified he used the sale proceeds to make a mortgage payment.

Indeed, Debtor next sold his house. He said he had wanted to keep his home, but he could not keep up with it. The mortgage was $2,200 per month, and the associated expenses, e.g., heat for 5,900 square feet, were costly. Debtor sold some of the personal property he received in the divorce as a part of the sale of the house. Specifically, a spa, pool table and accessories, washer/dryer, mirror, refrigerator, television, home theater system and furniture, patio furniture, and other items. Many of the items were built or wired in.

On September 16, 2009, Debtor deposited $83,139.62 in proceeds from the sale of the house into an account that he had opened in August 2009, with a deposit of $1,000.00. He deposited an additional $3,079.04 from the remaining escrow from the sale of the house into the account on October 7, 2009.[3] He testified that he wanted to keep the proceeds from the sale of his house in a

---

[3] As of December 8, 2009, the account had a balance of $87,417.72.

separate account because he knew it would be exempt if he ultimately needed to file for bankruptcy.[4] He testified that bankruptcy was a consideration at the time but was not his desired outcome.

In September 2009, Debtor paid $1,353.30 to Assurant Health for six months of insurance. He also wrote two checks to Vonage, one for $33.51 and another for $320.42. The first was for a land line, and the second was to receive a discount for paying annually. Debtor also bought a printer for $201.59 and a netbook computer for $378.34, both of which Debtor bought for his work with Coyote.

Finally, Debtor sold the vacant school building on October 23, 2009, and netted $6,155.99. He testified he sold the land and the building separately and received more for them separately than he would have had he sold them together.

The sales of his house and the vacant school gave Debtor the freedom to look for work elsewhere, and he returned to Arizona to work for Coyote for a couple months. He still was not paid a specific rate, but instead was paid a percentage of each job he completed. He worked at Coyote approximately two months and he earned $6,700.00. He worked there until the beginning of November 2009, and then left Arizona because of a falling out with the owner of Coyote.

At that point, Debtor's last resort was going into business himself, and he looked into the feasibility of manufacturing hydraulic doors. Although he previously testified that he had no real experience in the engineering field, when discussing the topic of this business idea, Debtor testified he had worked as an engineer and had investors on the line. He did not initiate the business,

---

[4] Debtor testified that he has since bought another home in New Rockford.

however, because the concept had some engineering challenges that needed to be ironed out before he could begin manufacturing.

There are also three prepetition checks to Vogel Law Firm, dated November 12, 2009 ($497.00), November 25, 2009 ($941.00), December 21, 2009 ($2,000.00).

Debtor filed a voluntary chapter 7 petition on December 31, 2009. Debtor decided to file when he realized that engineering costs related to his door idea were problematic and that he no way of generating income to deal with his obligations to GMAC and North Star.

On January 14, 2010, Debtor filed his bankruptcy schedules and statement of financial affairs. He listed more than $4.2 million in total liabilities. Schedule B lists $87,300.00 in a savings account from the sale of his home in September 2009. It also lists "All household goods and furnishings, including living room sofa, chairs, tables, television, stereo, lamps, kitchen table and chairs, cookware, dishes, silverware, small appliances, frdige [sic], freezer, bedroom furniture and accessories, and computer and accessories" valued at $1,000.00. Debtor also individually itemized and valued three bicycles, a home theater speaker system, an electric guitar, and an amplifier.

At trial, the trustee asked Debtor why he itemized some of his household goods and furnishings but not all of them in light of the fact that Debtor's divorce settlement included 12 pages of personal property. Debtor said that he was confused about how to fill out the schedules and did not know he was supposed to list all his property individually. Moreover, he said it did not seem like 12 pages of property would fit on the schedules. As for the $1,000.00 listed for household goods, he said he knew that value of his other household goods was far more than $1,000.00. He said it was not his intent to represent that the value was only $1,000.00, but that it was a mistake on his part.

He testified he knew his exemption was limited to $1,000.00, and he knew that he had to either make the nonexempt property available for auction or buy it back from the bankruptcy estate.

Schedule D lists Gate City Bank as a creditor with a claim of $17,676.00 secured by a 1999 Chevrolet Corvette convertible.  He bought the car for $20,000.00 in 2008.  Debtor's account statements, however, indicate a loan balance as of December 19, 2009, of $12,373.49.  Debtor testified he was not sure where the amount of the claim against the car that he listed on Schedule D came from but said it was an error.  Although it looks like the claim against the Corvette is overstated by $5,000.00, Debtor said that was not his intent.

On his Statement of Financial Affairs, Debtor did not list any income from 2009 because, he testified, he was not sure what his income was in 2009.

The Statement of Financial Affairs includes a sections on gifts.  It states, in relevant part:

> List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200.00 in value per individual family member and charitable contributions aggregating less than $100 per recipient.

Debtor disclosed a gift of $500.00 on October 24, 2009, to his daughter.  Debtor's account records show the following checks to his children in 2009:[5]

| | | |
|---|---|---|
| 7/7/09 | Emily Danduran | $500.00 |
| 7/31/09 | Emily Danduran | $1,500.00 |
| 8/15/09 | Leah Danduran | $1,000.00 |
| 12/15/09 | Emily Danduran | $200.00 |
| 12/15/09 | Leah Danduran | $200.00 |
| 12/15/09 | Chris Danduran | $200.00 |

---

[5] There are also two other checks to Debtor's sons, Jacob and Luke Danduran, for $100.00 each on December 15, 2009, but these gift are less than the $200.00 amount that triggers the disclosure requirement on the statement of financial affairs.

The trustee asked Debtor how he knew what to disclose as to gifts.  Debtor testified that he thought had to list gifts of over $250.00 in the last 90 days.

Debtor testified that the personal property he sold with the house was not listed or disclosed separately from the house in his petition because it was a part of the house sale. The property described in the disclosure about the sale of the house characterized the sale as of the "[h]ome and equipment/furnishings."

In addition to the sale of his house, Debtor also listed the sales of the dealership, duplex and former school lot in his Statement of Financial Affairs.  He also listed the payment on his son's student loans in July 2009.

The Statement of Financial Affairs also asks for a list of all payments made by a debtor, including attorneys, for consultation concerning debt consolidation, relief under bankruptcy law or preparation of a bankruptcy petition withing one year preceding commencement of the case.  Debtor listed $2,000.00 to Vogel Law Firm on December 28, 2009, and $50.00 to Village Family Services on December 30, 2009.

On January 14, 2010, Debtor filed a payment advice cover sheet explaining he was not employed within 60 days of his bankruptcy but did receive a check in November 2009 for employment in September and October 2009.

Debtor filed amended schedules and statement of financial affairs on January 21, 2010. Debtor added additional sales of property.  Specifically, Debtor added the sale of the lot in September for $15,000.00, the sale of the vacant school building in October for $7,500.00, the sale of the gun safe and guns, and the sale of the boat.  He also added a payment of $5,000.00 to Vogel Law Firm in February 2009.

11

The meeting of creditors in Debtor's bankruptcy case was held on January 29, 2010. Debtor testified that his prepetition property sales were discussed at the meeting of creditors, and the trustee asked for records from the sales which he provided. The divorce decree, including a 12-page detailed list of all of his household possessions, was also discussed at the meeting. The trustee went through the list and asked Debtor which items he still had. The fact that Debtor sold personal property with his house was also discussed. The trustee asked Debtor if he bought any property since February 2009, and Debtor told the trustee about the computer and printer. The trustee acknowledged that Debtor testified about his Arizona income and answered all of his questions in general.

A letter from Debtor's attorney to the trustee dated February 23, 2010, references the Highway 281 property sale. The trustee testified he did not know about the sale until he received this letter.

Debtor filed another amended statement of financial affairs on March 18, 2010, disclosing the three gifts of $200.00 each to three of his children. When asked why these gifts were not listed initially, Debtor testified that it was an error on his part. He explained that the newly-disclosed gifts were to three of his children in the amount of $200.00 each for Christmas in 2009. Debtor still did not disclose the July 31, 2009, gift of $1,500.00 to his daughter Emily who he testified was pregnant and single. He also did not list the $1,000.00 he gave his daughter Leah when she started college. Debtor conceded that he did not accurately list all the gifts. He testified he misread the question as requiring only a 90-day lookback period, and did not include the gifts earlier in the year to his daughters.

The March 18, 2010, amendments also added the sales of gold, the Chevrolet Aveo, and an all-terrain vehicle to the disclosed transfers. Debtor still not list the sale of the Highway 281

12

property. He testified, however, that he was not aware that it was not listed until trial. Debtor's bankruptcy schedules, original or amended, also do not include Debtor's income from Coyote between September 2008 and January 2009. When asked why Debtor did not list the lawnmower in his bankruptcy schedules, Debtor answered, "It's a lawnmower!" Debtor also conceded that he omitted the sale of a bicycle for $750.00.

Debtor testified he did not realize Schedule B of his petition listed the general household goods as valued at $1,000.00 until the trustee filed an objection to his exemptions on February 26, 2010.  Debtor offered to purchase all the nonexempt household goods and furnishings from the estate for $9.000.00 on March 26, 2010.

Don Mauseth prepared a valuation of all of Debtor's personal property dated May 24, 2010. Mauseth valued the personal property included in the sale of Debtor's home at $7,700.00.  Debtor testified that it would have been impossible to get those items of property out of the house without major damage to the home.  Mauseth valued the gun safe and three guns Debtor sold to Schaefer Farms at a total of $5,250.00.  Debtor testified that the computer and printer were at his house when Mauseth did his appraisal.  Debtor said he thought his offer to buy all the nonexempt household goods included all the personal property he had at his home when Mauseth was there, and that included the computer and printer.

Debtor testified he made every attempt to give the trustee everything he had in terms of financial information.  He gave the trustee all his personal and business account information and all the records for the sales of property, and the trustee acknowledged that Debtor eventually provided most of what the trustee asked for in terms of records. Debtor also testified that every one of the sales of property was for an amount that Debtor thought was at least fair value if not more.  He did

13

not continue to use any of the property he sold, and he did not sell any of the property to family members. Debtor testified he did not gamble away the sale proceeds or fund his retirement. He did not buy any property that he could exempt or invest in his business ideas.

The parties agree Debtor received approximately $105,000.00 in total sale proceeds excluding the sale of his house. Debtor used his checkbook ledger to identify several major expenses for 2009. These include:

| | |
|---|---|
| House payments | $17,210.00 |
| Rent payments | 4,250.00[6] |
| Attorney fees | 13,957.00 |
| Car payments | 7,244.00 |
| Student loan | 24,375.00 |
| Home reconditioning | 4,214.00 |
| Property sale expenses | 2,646.00 |
| Duplex payments | 1,784.00 |
| Property taxes | 10,022.00 |
| Insurance | 3,353.00 |
| Utilities | 3,107.00 |
| TOTAL | $92,162.00 |

Debtor explained that he paid rent in Arizona and Kansas City while he was working and looking for work. Some of the attorney fees were from his divorce. The car payments were for both the Corvette and the Aveo. The student loan was for his son's education. The insurance includes property insurance and health insurance with a $5,000.00 deductible. He sold the personal property that he did to pay taxes as they came due, he said.

During the year preceding his bankruptcy, Debtor had several expenditures to, or on behalf of, Cheryle Huntzinger. He testified she was his girlfriend at the time, and when he came back from

---

[6] Debtor broke down the rent payments as follows: $1,900.00 for the Arizona townhouse plus $350.00 for a partial month; $1,400.00 for two months in Kansas City; and $600.00 to Huntzinger for two months.

Arizona for hearings in his divorce case, he stayed with her. Debtor wrote checks to her on March

18, 2009, for $600.00 and March 22, 2009, for $818.82.  He said the checks were for assistance on

the rent while he stayed with her, and also for help she gave him with his house.  Huntzinger paid

bills for him while he was in Arizona, an some of the handwriting in his checkbook ledger was hers.

On June 2, 2009, Debtor wrote a check for $1,480.00 to Scott's Repairs.  Debtor testified he had

borrowed Huntzinger's vehicle and wrecked the transmission, and this check was to repair it. On

September 18, 2009, $750.00 to Eugene Kaul, Debtor said to help Huntzinger buy the vehicle that

Debtor was borrowing from her. On December 20, 2009, another check to Huntzinger, this one for

$500.00, Debtor said was to reimburse her for an expense she paid for him.

North Star won a judgment against Debtor on March 17, 2010 for $402,110.78. GMAC won

a deficiency judgment against Debtor on April 6, 2010, in the amount of $338,627.05.

The Court entered an order on January 19, 2011, ordering Debtor to turn over the computer

and printer to the trustee, but as of the trial date, Debtor still had not done so. Debtor testified that

he brought those items to court to give to the trustee.

## II.  CONCLUSIONS OF LAW

By his Complaint, the trustee argues for the denial of a bankruptcy discharge to Debtor.  The

trustee argues Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2), on the ground

that Debtor transferred, removed or concealed assets of the bankruptcy estate with an intent to hinder

delay or defraud creditors or the bankruptcy estate; pursuant to 11 U.S.C. § 727(a)(3) on the ground

that Debtor concealed or failed to keep records as to his financial condition and transactions; and

pursuant to 11 U.S.C. § 727(a)(4)(A), on the ground that Debtor failed to disclose all personal

15

property which he had an interest in at the time of the filing of the bankruptcy and failed to disclose all transfers of property he was required to disclose.

Section 727(a) of the Bankruptcy Code provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

* * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a drastic remedy.  Kaler v. Huynh (In re Huynh) 392 B.R. 802, 809 (Bankr. D.N.D. 2008).  In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter.  Id. at 809-810.  The standard of proof is a preponderance of the evidence.  Id.

A.       11 U.S.C. 727(a)(2)(A)

16

The elements essential to barring a discharge under section 727(a)(2)(A) are:

(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Id. at 810.  Debtors rarely admit to a fraudulent intent, and parties seeking denial of a debtor's discharge must generally rely on a combination of circumstances that suggest that debtor harbored the necessary intent.  In re Huynh, 393 B.R. at 810.  Courts consider several factors in determining whether a debtor acted with intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.  Id.

The trustee alleges Debtor concealed the transfer of certain personal property by designating it as proceeds of the sale of real estate and claiming it as exempt as his homestead. The personal property that Debtor sold with the house was not listed separately from the house because it was a part of the house sale.  He included the items with the house because many of them were built and wired in. Debtor did not conceal the fact that these items were sold with the house.  The fact that personal property was sold with the house was disclosed and was brought up at the meeting of

17

creditors.  Debtor turned over all the records including the purchase agreement with the listing of the personal property included.  This is inconsistent with concealment.

At trial, the trustee also argued that Debtor concealed his Arizona income by not listing it in the statement of financial affairs.  On January 14, 2010, Debtor filed a payment advice cover sheet explaining he was not employed within 60 days of his bankruptcy but did receive a check in November 2009 for employment in September and October 2009.  Debtor stated he did not have a payment advice because he was paid by personal check. The trustee acknowledged that Debtor testified about his Arizona income at the meeting of creditors and answered all of the trustee's questions.  Although Debtor failed to disclose his Arizona income on his statement of financial affairs, his other conduct was inconsistent with concealment.

Some of Debtors other transfers of property are more problematic with respect to the trustee's allegation that Debtor generally wasted his assets by spending them on nonessential goods, intending to dispose of them rather than allow the assets to be used to pay his creditors. First, Debtor omitted the sale of the Highway 281 property from his statement of financial affairs although he did inform the trustee about the sale through a letter sent by Debtor's attorney on February 23, 2010. Debtor claims that he was unaware that the Highway 281 property was not listed until the hearing because the trustee never mentioned it, and that there was no motive for him to hide the transaction which was for fair value. Notwithstanding, a debtor's obligation to disclose a transfer is not triggered by a trustee's acknowledgment or urging.

Next, Debtor gave several gifts to his children in the year preceding his bankruptcy filing. Several of the circumstances that suggest fraudulent intent exist as to these gifts, most notably that they were voluntary gifts to family members made while Debtor's financial condition was dire and

18

he had been sued by GMAC and North Star.  He also did not disclose all the gifts to his children, even after multiple amendments, which suggests a secrecy to the gifts.  See id.

Another problematic transfer is the payment to Bank of North Dakota to pay in full Debtor's obligation on his son's student loans.  Debtor testified that he had talked with his attorney about what types of obligations would be nondischargeable in bankruptcy, and this debt happened to be Debtor's only such debt.  Debtor listed more than $4.2 million in debt in his bankruptcy, and rather than use the proceeds from the sale of the dealership to pay dealership debts or any other debt, Debtor paid the student loan debt instead.

Debtor also made several payments to, or on behalf of, his girlfriend in the year preceding his bankruptcy filing.  Although he offered justifications for the transfers, the circumstances around them suggest fraudulent intent.

Any of the above transfers, in isolation, might have passed scrutiny, but based on the entire record, the general chronology of events and transactions cumulatively establish that Debtor intentionally maximized his exempt estate through the transfers to defraud creditors.  He liquidated assets that he could not exempt, and paid only on debts that were beneficial to him because they were on exempt property or were nondischargeable.  Although Debtor claims he sought to avoid bankruptcy, his conduct shows he sought to avoid bankruptcy long enough to convert his assets into exempt property, and indeed, nearly all of Debtor's property was exempt by the time of his filing.  For these reasons, the trustee has met his burden under section 727(a)(2).

B.    11 U.S.C. § 727(a)(3)

A debtor may be denied a discharge pursuant to section 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified

under all the circumstances of the case. In re Huynh, 392 B.R. at 811. Debtors are required to keep adequate financial records to enable parties and the court to trace the debtor's financial history, reconstruct financial transactions, and test the completeness of the disclosure requirements.  Id. Intent is not an element of this ground for denial of discharge; the standard imposed is one of reasonableness. Id.  The debtor is therefore required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate.  Davis v. Wolfe (In re Wolfe), 232 B.R. 741 (B.A.P. 8th Cir. 1999).  Discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition. Id. Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them. Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark.2005). The complaining party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions. Id. If the debtor breaches his duty to his creditors to keep adequate records, he is given the opportunity to provide some justification for the breach. Id.  If the debtor cannot justify his failure to keep adequate records, discharge will be denied. Id. "What constitutes adequate records must be decided on a case-by-case basis." Hillis v. Martin (In re Martin), 124 B.R. 542, 543 (Bankr. N.D. Ind. 1991).

In this case, the trustee alleges Debtor failed to maintain adequate records to explain the dissipation the property sales in the year preceding his bankruptcy filing. Debtor identified $92,162.00 in major expenses from the $105,000.00 total sale proceeds. The trustee acknowledged that he eventually received all the records and information he was seeking. On the whole, Debtor's

records and identified expenses are reasonably sufficient to ascertain his financial condition and

transactions.  Accordingly, section 727(a)(3) does not provide a basis for a denial of discharge.

C.    11 U.S.C. § 727(a)(4)(A)

A debtor may be denied a discharge pursuant to section 727(a)(4)(A) if the debtor knowingly

and fraudulently, in or in connection with a case, made a false oath or account. In order to deny a

debtor a discharge under this subparagraph, a plaintiff must establish that: (1) the debtor knowingly

and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4)

regarding a material matter. Korte v. United States (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir.

2001). A debtor's signatures on the petition, made under penalty of perjury, are declarations which

have the force and effect of oaths of the kind encompassed by the discharge exception for making

a false oath. Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) (overruled on

other grounds). The proper functioning of the entire bankruptcy process is dependent upon debtors

providing complete, accurate and reliable information in the petition and other documents submitted

with the filing of the case so that parties in interest may evaluate debtors' assets and liabilities and

appropriately administer the case. Id. Courts are often understanding of a single omission or error

resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of

reckless indifference to the truth, which is the functional equivalent of intent to deceive. Kaler v.

Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004). A debtor, however, has an absolute

right to amend his or her schedules. See Fed. R. Bankr. P. Rule 1009(a).

For a false oath or account to bar a discharge, the false statement must be both material and

made with intent. In re Geller, 314 B.R. at 808. The threshold to materiality is fairly low. Id. The

subject matter of a false oath is "material" and thus sufficient to bar discharge if it bears a

21

relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property. Id.

Intent to deceive can be established by circumstantial evidence, and statements made with reckless indifference to the truth are regarded as intentionally false. Id.  In In re Geller, the Court found that the debtors made numerous material false statements or omissions under oath that supported nondischargeability under section 727(a)(4)(A). The debtors made several fraudulently material omissions that they never cured. In re Geller, 314 B.R. at 807. They failed to disclose apartment furniture, a Sinatra print, a fax machine, the closure of a bank account, a $129,900 debt, and payments made to a creditor whose existence had not been disclosed. Id. They also made false statements under oath by providing false information to the trustee at the meeting of creditors. Id. The debtors claimed to merely have "perused" the schedules and statement of affairs because they relied on their attorney to completely and accurately prepare the documents. Id. The Court concluded that the debtors' failure to thoroughly read the schedules and statement of affairs, in conjunction with the numerous material omissions and inaccuracies, constituted reckless disregard for the truth. Id.

The trustee argues Debtor failed to disclose all personal property he had an interest in at the time of filing and that he failed to disclose all transfers of property he was required to disclose. As discussed above, Debtor failed to list the sale of the Highway 281 property.  Debtor also omitted the sale of a bicycle for $750.00.  He failed to disclose all the gifts to his children, and he was less than forthright about all the payments he made to his attorney who presumable assisted him in using his assets to his best benefit.  He did not disclose his purchase of the lawnmower in July or his purchase of the computer and printer on his bankruptcy schedules. Although these items might be

insignificant to Debtor, they are material to Debtor's estate. The trustee's knowledge of the computer and printer did not obviate Debtor's responsibility to list them in his petition. The same is true for his Arizona income. Debtor had ample opportunity to amend his schedules to include all of these omissions, and he did not. These multiple inaccuracies rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive. See id. For these reasons, the Court concludes that Debtor knowingly and fraudulently made a false oath in connection with this case, and section727(a)(4)(A) provide a basis for a denial of discharge.

The Court has considered all other arguments and deems them to be without merit.

Based on the foregoing, Debtor Lawrence D. Danduran, Jr. is **DENIED** a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2) and (a)(4)(A).

     **SO ORDERED.**

     **JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this August 19, 2011.

     **WILLIAM A. HILL, JUDGE**
     **U.S. BANKRUPTCY COURT**

23